ORDERED in the Southern District of Florida on February 12, 2008



John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

BRYAN ROAD, LLC,

  Debtor.
_____/

Case No. 07-17922-BKC-JKO

Chapter 11

### ORDER GRANTING FLORIDA COMMUNITY BANK'S
### MOTION FOR STAY RELIEF

This case presents the interesting question of the enforceability of a prepetition workout agreement in which the Debtor consented, on the eve of a foreclosure sale, to stay relief in the event the Debtor subsequently filed a bankruptcy case. In part because I conclude that the agreement at issue here is enforceable, I will grant stay relief over the objections of the Debtor, the Creditors' Committee, and junior lienholders so that the lender, Florida Community Bank (the "Bank"), may pursue its foreclosure proceedings in state court.

## Background

The Debtor is the developer of a condominiumized "dry stack" boat storage facility located in Dania Beach, Florida, on a canal with access to the Intracoastal Waterway and the Atlantic Ocean. The facility contains some 210 boat storage spaces, each of which constitutes a separate condominium unit, located in a warehouse-type building. The Debtor owned 191 of the units as of the petition date. According to the Debtor, the units were capable of storing vessels of between 28 and 52 feet in length, and with a maximum "rack" load capacity of 30,000 lbs. per vessel, and 37,000 lbs. per vessel for ground-level units. The Debtor has represented that it is the only such facility in South Florida which survived unscathed in the 2005 hurricane season.

## Legal description issues

The Debtor borrowed some $8.74 million from Florida Community Bank (the "Bank") in March 2006 pursuant to a note, and secured by a mortgage, security agreement, and assignment of rents. The mortgage and assignment of rents were duly recorded in the public records of Broward County, and the security agreement (which granted the Bank a security interest in substantially all of the Debtor's tangible and intangible personal property) was perfected by the timely filing of a UCC-1 financing statement in the Florida Secured Transaction Registry.

The legal description of the Debtor's property contained in the mortgage was as follows:

> Parcel "A" of Bryan Road Warehouses as recorded in Plat Book 170, Page 112 of the Public Records of Broward County, Florida together with a 40 foot strip of land lying adjacent to and contiguous with the easterly boundary of said Parcel "A", and extending said 40 foot strip of land southerly to the center line of West Dania Beach Boulevard as reflected in Plat Book 170, Page 112, of the Public Records of Broward County, Florida.

It is this legal description (the "Plat Book Legal Description") which gives rise to the Debtor's challenge to the Bank's mortgage.

The Debtor recorded a Declaration of Condominium in the Public Records of Broward County on August 18, 2005. It is agreed between the Debtor and the Bank that the effect of this recordation was to convert the Debtor's property into 210 separate boat storage condominium parcels. The Debtor contends that because the Declaration of Condominium was recorded prior to the Bank's mortgage, the Plat Book Legal Description used in the Bank's mortgage was fatally flawed and did not operate to convey a perfected lien on the property. The Debtor relies for this proposition on *Florida Statutes* § 718.121(1), which provides:

> (1) Subsequent to recording the declaration [of condominium] and while the property remains subject to the declaration, no liens of any nature are valid against the condominium property as a whole except with the unanimous consent of the unit owners. During this period, liens may arise or be created only against individual condominium parcels.

The Debtor contends that this statute means that because the Bank's mortgage did not describe "individual condominium parcels" it is legally ineffective to create a lien against the property. The Debtor relies for this proposition on *Bank One, Dayton, N.A. v. Sunshine Meadows Condominium Association, Inc.*, 641 B.R. 1333 (Fla. 1994). I conclude that the Debtor's reliance on § 718.121(1) and *Sunshine Meadows* is misplaced.

Section 718.121(1) expressly provides that a lien which describes "the condominium property as a whole" is permitted with the consent of all of the condominium unit owners. The Bank asserts its lien only against condominium units owned by the Debtor, which was the owner of all of the

condominium units when the mortgage was recorded and which remains the owner of the 191 units[1] upon which the Bank now seeks to foreclose.

The purpose of § 718.121(1) is made clear in *Sunshine Meadows*. Sunshine Meadows was a phase condominium. The developer executed a note and mortgage to Bank One on 1.43 acres of property in a proposed Phase II, which included common area space which was for the benefit of all unit owners in all phases of the project. When the developer defaulted, Bank One sought to foreclose as to the entire condominium property, including the undivided interests of each unit owner in common elements. The Florida Supreme Court held that the Bank One mortgage was ineffective against the unit owners, thereby protecting them from a lien granted by the developer against a part of the phased property, where unit owners (those in Phase I, for example) who did not consent to the Bank One mortgage and whose property rights in common elements would be impaired if the mortgage were foreclosed. It is clear that § 718.121(1) was designed to protect third party condominium unit owners from liens which would impair their units unless they consented to those liens.

The situation here is quite different. The Bank here seeks to foreclose its lien on the 191 condominiumized boat slip units owned by the Debtor and only upon those units; the Bank has released its lien on those units which have heretofore been sold by the Debtor. Since the Debtor was

---

[1] By Order [DE 125] entered January 31, 2008, I authorized the Debtor to sell two units to third-party purchasers with a significant portion of the sale proceeds escrowed to protect the Bank in the event the validity of its lien were upheld and with certain other conditions. Although the Bank consented to the sales on these conditions, it has moved for reconsideration [DE 132] on the grounds that the Order (which I directed be circulated to all counsel before submission) is inconsistent with my oral rulings. Because I assume that the two sales have not closed, I will refer to the Bank's collateral as the 191 units which were its collateral on the petition date rather than the 189 units (and escrowed sale proceeds) which would be its collateral if and when the Order becomes final and sales made pursuant to the Order actually close.

the sole owner of all 210 of the units when the Bank's mortgage was given, the mortgage received the "unanimous consent of the unit owners." The mortgage thus constitutes a valid lien on the 191 condominium units still owned by the Debtor.

## State court proceedings

Following the Debtor's default by failing to make contractual payments of principal and interest due October 28, 2006, and thereafter, the Bank commenced a foreclosure proceeding in the Circuit Court for Broward County, Case No. 07-001360 (the "Foreclosure Case"). Final judgment in the Bank's favor was entered in the Foreclosure Case on May 23, 2007. The Final Judgment describes the property using the Plat Book Legal Description, with the following addition:

> a/k/a
>
> DANIA BEACH BOAT CLUB, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM RECORDED AT OR BOOK 40327, PAGE 905, PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.
>
> Less and except the following:
>
> | Unit No. 105A | Unit No. 205D |
> |---|---|
> | Unit No. 207C | Unit No. 102B |
> | Unit No. 202D | Unit No. 103B |
> | Unit No. 209A | Unit No. 202C |
> | Unit No. 104B | Unit No. 204C |
> | Unit No. 501B | Unit No. 207D |

The Final Judgment set a foreclosure sale for July 25, 2007.

## The Forbearance Agreement

On the morning of the foreclosure sale, the Debtor and the Bank entered into an agreement (the "Forbearance Agreement") which was approved by the Court in the Foreclosure Case and

pursuant to which the foreclosure sale was rescheduled to September 26, 2007. The Forbearance Agreement also provided as follows:

> (a) the Bank should be accorded relief from the automatic stay in the event the Debtor filed for bankruptcy protection as consideration for the Bank entering into the Forbearance Agreement;
>
> (b) the Final Judgment would continue to accrue interest at the rate set forth therein; and
>
> (c) the Debtor, among others, waived all claims, counterclaims, defenses and causes of action against the Bank.

Among those present at the meeting between the Bank and the Debtor at which the Forbearance Agreement was executed was Andrew J. Nierenberg, Esquire, the Debtor's bankruptcy lawyer. Mr Nierenberg is a very experienced bankruptcy practitioner. He filed this chapter 11 case for the Debtor on September 25, 2007, the day before the rescheduled foreclosure sale. The Debtor's case was expressly filed for the purpose of delaying that sale.

The Bank filed its motion for stay relief [DE 19] on October 12, 2007. A preliminary hearing on the motion was held on November 5, 2007. At that hearing, the Debtor raised, for the first time, the issue that the legal description contained in the mortgage was insufficient because a declaration of condominium had been recorded prior to the recording of the mortgage. Following briefing and further argument, and as discussed above, I am satisfied that the legal description contained in the Bank's mortgage is legally sufficient. I am also satisfied that the Forbearance Agreement is enforceable in accordance with its terms.

There is considerable case law on the enforceability of prepetition agreements under which a debtor purports to consent to stay relief in the event of a subsequent bankruptcy filing. *See, e.g., In re Desai*, 282 B.R. 527 (Bankr. S.D. Ga. 2002); *In re Excelsior Henderson Motorcycle*

*Manufacturing Company, Inc.,* 273 B.R. 920 (Bankr. S.D. Fla. 2002) and cases cited. As a general proposition, prepetition waivers of stay relief will be given no particular effect as part of initial loan documents; they will be given the greatest effect if entered into during the course of prior (and subsequently aborted) chapter 11 proceedings. Although I agree that stay relief provisions in prior chapter 11 plans are entitled to great respect because they have been negotiated in a plan context and approved after notice to all parties in interest, I conclude that the existence of a prior confirmed reorganization plan is not a condition precedent to the enforceability of a stay relief agreement. I agree with Judge Laney's analysis[2] in *Desai* that prepetition agreements waiving the automatic stay are neither *per se* enforceable nor self-executing. Judge Laney held that the following four factors should be considered in deciding whether stay relief should be granted based upon such waivers:

> (1) the sophistication of the party making the waiver; (2) the consideration for the waiver, including the creditor's risk and the length of time the waiver covers; (3) whether other parties are affected including unsecured creditors and junior lienholders; and (4) the feasibility of the debtor's plan.

*Desai,* 282 B.R. at 532.

I agree that these factors are relevant, although I am not prepared to hold that they are necessarily the only factors which might properly be taken into account. Taking them into account here, I conclude that the first factor weighs heavily in favor of enforcement. As noted above, Mr. Nierenberg is a very experienced bankruptcy lawyer fully capable of understanding the implications of the Forbearance Agreement.

The second factor is more problematic. What the Debtor got in exchange for the waiver was a two month breathing space, not a very lengthy period. At the time, however, the Debtor was

---

[2]Judge Laney's analysis in turn relied on *In re Sky Group International, Inc.,* 108 B.R. 307 (Bankr. W.D. Pa. 1989).

engaged in refinancing efforts and expected to be able to refinance the Bank's loan with another lender. It was unable to do so. Although the consideration given to the Debtor in exchange for the Forbearance Agreement was not in retrospect particularly great, it was what the Debtor wanted at the time the Forbearance Agreement was signed. I cannot say that this consideration was *de minimis* in this context.

There are other parties in interest in this case, including two junior *pari passu* mortgage holders and some unsecured creditors. The Debtor (and the Creditors Committee) have pointed to the existence of some $973,000 in unsecured claims as a significant interest which should be protected through the denial of stay relief. The third *Desai* factor thus appears – at least on its face – as militating against stay relief. The nature of some of those claims, and their proposed treatment under the Debtor's chapter 11 plan (the fourth *Desai* factor), are interrelated and bear further scrutiny.

The Debtor's Plan here is largely premised on litigation. It offers two proposed treatments of the Bank. Under the first, the Bank's mortgage is invalidated and it is to be paid as an unsecured creditor in an amount substantially less than the amount of the foreclosure judgment entered by the State Court.[3] Under the second, which is based upon a prospective determination that I uphold the validity of the Bank's mortgage, as I have done in the discussion above, "the Debtor in Possession will commence an appeal. In the meantime, and pending a final determination of the controversy, no distributions will be made to Florida Community Bank." The Debtor makes clear in its Disclosure Statement that "in the meantime" the Debtor intends to sell condominium boat slip units

---

[3]The Debtor's Disclosure Statement [DE 90] does not explain why this judgment is not entitled to preclusive effect.

"free and clear of all liens, claims and encumbrances, including the claim of Florida Community Bank." The Debtor asserts that it is entitled to do so "because of the valuation of the condominium units owned by the Debtor in Possession." Valuation issues are discussed below.

There are two asserted second mortgage claims against the Debtor according to its Disclosure Statement. One, held by Terry McEwen, arises out of his having posted a $1.1 million certificate of deposit as additional collateral to the Debtor's construction lender, JDI Dania, LLC ("JDI"). That CD was drawn by JDI during the course of construction. The Debtor acknowledges that McEwen holds a $250,000 claim also secured by his mortgage arising out of a "contracted-for exit fee." The Debtor advises in the Disclosure Statement that it "reserves the right" to object to McEwen's claim under a theory that McEwen wrongfully refused to issue partial releases of units to purchasers "notwithstanding his contractual obligation to do so."[4]

The other second mortgage claim, held by Philip Schuman, arises out of Schuman's posting of a $1 million certificate of deposit as additional collateral for JDI which was also drawn upon during construction. The Schuman and McEwen mortgages are *pari passu* and are junior to the Bank's mortgage.

The Debtor advises in the Disclosure Statement that it will object to any payment of "additional interest or counsel fees" on account of either McEwen's claim or Schuman's claim. Since the Debtor asserts that it has very substantial equity in the property, it is quite unclear how the Debtor thinks it can in such circumstances preclude the payment of interest or attorneys' fees to McEwen and Schuman. Under 11 U.S.C. § 506(b), the holder of a claim secured by property with

---

[4]McEwen timely filed a proof of claim asserting total claims in the amount of $1,944,052.05.

a value greater than the amount of the claim is entitled to interest and reasonable fees, costs and charges provided for under the agreement under which the claim arose. What is clear, however, is that the Debtor's treatment of the McEwen claim and the Schuman claim – like its treatment of the Bank's claim – will require extensive litigation.

The Debtor separately classifies unsecured claims arising under an executory contract of The Formula, Inc., and/or Brian Neiman (collectively, "The Formula").[5] Without going in to the particulars of The Formula's contract to buy some 36 boat slip units at what the Debtor contends are unreasonably low prices, the Debtor indicates that it both intends to reject that contract and will "vigorously contest all claims asserted by The Formula," and that it "intends to commence an adversary proceeding against The Formula, Brian Neiman, their attorneys and agents" and against First Integrity Bank and its attorneys, officers, directors and agents, all under theories of fraud. The Debtor also separately classifies the unsecured claims of The Formula without explaining in its Disclosure Statement any legal justification for such classification. Here again, the Debtor proposes to engage in massive litigation as the fundamental basis for its Plan.

As noted above, the Debtor has made much of the fact that some $973,000 in unsecured claims exist in the case in contending that this case is not fundamentally a dispute between the Debtor and the Bank. The Debtor has made clear, however, both in its schedules and in the Disclosure Statement, that it asserts that a significant majority of these claims (more than $650,000 of the $973,000 in claims, or over two-thirds) are disputed. Here again, the viability of the Debtor's Plan from a legal standpoint is premised upon litigation.

---

[5]The Formula timely filed its proof of claim for breach of contract in the amount of $4,785,311.

10

The viability of the Debtor's Plan from a financial standpoint is premised upon the value of the remaining 191 boat slip units. The evidence which the Debtor has presented comes from a series of appraisals prepared by Bondarenko Associates, Inc. ("Bondarenko") and submitted by the Debtor at the hearing in this case on December 7, 2007. The appraisals are dated as of May 27, 2005 (the "First Appraisal"); April 20, 2007 (the "Second Appraisal"); and on an amended or restated basis, September 4, 2007 (the "Third Appraisal").

The First Appraisal, which was prepared by Bondarenko for AmBanc Commercial Lending Services, utilizes two of the three traditional valuation methodologies.[6] On a replacement cost basis, Bondarenko estimated the value of the entire facility (including boat slip units subsequently sold) at $10,700,000. This amount is less than the balance due on the Bank's final judgment.

After reaching his conclusion as to replacement value, Bondarenko largely abandons consideration of any valuation methodology other than comparable sales. But it is noteworthy that both an income approach (see footnote 6 above) and a replacement cost approach suggest that the value of the remaining 191 units is less, perhaps significantly less, than the Bank's secured claim.

Utilizing a comparable sales methodology, Bondarenko estimated the gross sales value of the entire facility, again including units subsequently sold, at $25,373,000. Of critical importance in testing this figure, I look at the actual sales prices obtained for the only two units which the Debtor

---

[6]Bondarenko did not utilize an income approach in valuing the project, taking the curious position that it was "not applicable due to the project being a condominium." I do not understand why this should be so, since condominium units can be and are being rented; in fact, the Debtor's only postpetition income has been from the renting of various unsold units. It is noteworthy that the Debtor's *gross* income has almost entirely gone to support the routine operating expenses of the condominium association and that the Debtor has enjoyed virtually no *net* income. The income approach to valuation starts with an analysis of net income, which may explain why the Debtor has provided no valuation information based upon an income approach: any such valuation would be extraordinarily low.

11

has sought to sell since filing its petition on September 25, 2007. I note that Bondarenko attributed a value of $150,500 to Unit 108B and $210,000 to Unit 205B in reaching his sales comparable total gross sales value of $25,373,000. As noted below, these two units were sold by the Debtor at substantially lower prices.

The $25 million gross sales valuation in the First Appraisal was premised upon a sell off of all of the units over a period of two years from the May 2005 appraisal date. Utilizing traditional valuation methodologies, Bondarenko then discounted the sales comparable value to $17,800,000, which he indicated was his estimate of the market value of the entire project, including subsequently sold units, as of May 2005.[7]

In the Second Appraisal, Bondarenko revised his estimated gross sales value from $25,373,000 to $31,023,400, raising his projected average gross sales value from $120,820 per unit to $147,730 per unit. After discounting the estimated gross sales price to present value, he estimated the market value of the 210 units in the complex at $22,576,582.[8] This represents a 26.8% increase in market value from May 2005 to April 2007.

Focusing again on the two units which have been sold postpetition, the Second Appraisal increases the gross sale value of Unit 108B from $150,500 to $210,000, and decreases the value of Unit 205B from $210,000 to $180,600.

---

[7] Bondarenko assumed a "projected developer profit" in the First Appraisal and in the Second Appraisal. The addition of these notional profits to the market valuations contained in the appraisals would increase the appraised values for bankruptcy purposes, but as noted below, those values appear highly inflated even as stated in the appraisals.

[8] To this amount he added attributed values of various equipment and improvements to reach a market value at April 20, 2007 of $23,140,000. For convenience, I will use this figure as representing the market value as estimated by Bondarenko in the Second Appraisal.

Finally, the Third Appraisal recalculates the gross sales value of the project as of the same April 2007 date of the Second Appraisal by calculating the value of 191 units in the dry stack storage facility "plus 7 wet slips not included in my original report." There are apparently some 12 wet slips at the facility, and Bondarenko's Third Appraisal apparently posits -- without anywhere saying why -- that five wet slips would be sufficient to service the entire 210-unit dry stack facility.

In analyzing the appraisals, I note first that the First Appraisal was premised upon an assumption that the entire 210 unit facility would be sold out in two years from May 27, 2005, or by May 27, 2007. In fact, we now know that the Debtor had successfully sold only 19 units by the petition date, September 25, 2007. It was also premised on stated values of individual units, including the premise that Unit 108B had a retail value of $150,500 and Unit 205B had a retail value of $210,000. On January 2, 2008 [DE 93], the Debtor sought authority to sell these two units for $125,000 each, which represented a discount of between 17% and 40% from Bondarenko's notional retail values, an average discount of 28.5% from the First Appraisal's notional retail values. After notice and a hearing, I authorized the sale of these two units at these substantially reduced prices by Order [DE 125] entered January 31, 2008. No party in interest objected to the sales of these two units at these prices.[9]

If one reduces the gross market value in the First Appraisal by the average 28.5% reduction from Bondarenko's notional retail values to the actual sales values for the only units which the Debtor has sought to sell postpetition, the First Appraisal's fair market value is reduced by

---

[9] As noted above, the Bank has sought reconsideration on the basis that the Order, submitted by Mr. Nierenberg after apparently not circulating it to other counsel as he had been directed to do, does not comport with my oral rulings at the hearing.

$5,073,000 from $17,800,000 as appraised to a restated fair market value of $12,727,000[10] as of May 2005, without taking into account that the Debtor has sold a mere two units since it filed its bankruptcy petition, and still owns 189 (or 191) units. Thus, instead of selling all 210 units in two years[11] as the First Appraisal estimated and upon which the values in the First Appraisal were premised, the Debtor has in fact sold only at most 21 units – a mere 10% of the units – in the two years and eight months since the effective date of the First Appraisal.

The Second Appraisal (and at least by implication, the Third Appraisal, which represents a restatement of the Second Appraisal rather than a new appraisal) is premised upon an assumption that the entire 210 unit facility would be sold out in six months from April 21, 2007, or by October 21, 2007. In fact, we now know that the Debtor had successfully sold only 19 units by the petition date, September 25, 2007. It was also premised on the values of individual units, including the premise that Unit 108B had a retail value of $210,000 and Unit 205B had a retail value of $180,600. The actual sales prices achieved for these units of $125,000 each represent discounts of 40% and 31%, respectively, from Bondarenko's estimates of retail value, an average discount of 35.5% from the Second Appraisal's notional retail values.

---

[10]This number bears a much greater resemblance to the replacement cost valuation of $10,700,000 contained in the First Appraisal than do the more speculative market valuations. As noted above, and for reasons which are unexplained, Bondarenko appears to give no weight to replacement cost in his opinions of value contained in any of the appraisals.

[11]On the opinion page of the First Appraisal, page 2, Bondarenko states that "we estimate the market exposure period necessary for the subject to have achieved this value to be 6 months." However, in the Reconciliation and Final Value Estimate, page 72, the First Appraisal states that "[a]fter the rack rates were estimated for the subject property, the total retail sell-out was calculated and a projected sell-out period of two years was estimated." Whether Bondarenko assumed a sell out in six months or two years, the Debtor has utterly failed to sell the units.

14

If one reduces the gross market value in the Second Appraisal by the average 35.5% reduction from Bondarenko's notional retail values to the actual sales values for the only units to have sold postpetition, the Second Appraisal's fair market value is reduced by $8,214,700 from $23,140,000 as appraised to a restated fair market value of $14,925,300 as of April 2007, again without taking into account the Debtor's complete failure to sell units.

Whatever the cause of the Debtor's failure to sell units, either before or after the filing of its petition in September 2007, it is clear to me that Bondarenko's notional fair market values must be substantially reduced not only because the Debtor has been unable to achieve Bondarenko's assumed prices, but also because of the Debtor's demonstrable inability to sell units in the time frames Bondarenko assumed in applying his discounted cash flow analysis. Since Bondarenko has not expressed his assumptions as to the proper discount rate to be applied in such an analysis, I will not conjure one up here, but will simply note that property which sells tomorrow, or next year, or ten years from now, is worth proportionately less than if it sold today. The Debtor's Disclosure Statement says that the Certificate of Occupancy for the project was issued May 10, 2005. In the intervening two years and nine months, the Debtor has sold at most 21 units, exactly 10% of the total boat slip units in the entire project. At that rate of sales, it will be more than two decades before the project is sold out.

The Debtor's Plan is premised on the sales of boat slip condominium units free and clear of liens. It proposes to pay *ad valorem* real property taxes owed to Broward County, for which the County has asserted a claim of $260,292.24 plus interest, but in a manner seriously objectionable to the County. It proposes to pay nothing to the Bank until it concludes to finality all litigation over the validity of the Bank's mortgage, a period I estimate on the basis of experience as taking from 18

to 30 months. It proposes to litigate with both the Bank and a substantial majority of all other creditors, secured and unsecured.

Based upon its performance, both pre- and postpetition, I conclude that the Debtor's Plan is speculative at best. The values it asserts are unsupported by its sales performance, and the rate of sales estimated as required in the Bondarenko appraisals has been missed by a margin so great as to make reasonable calculations of sales projections impossible. It is clear that the values asserted by the Debtor are grossly overstated and that the fair market value of the property will at some point soon, if it has not already, cross the rising trajectory of the Bank's secured claim.

In applying the facts of this case to the third and fourth *Desai* considerations (effect on other creditors and plan feasibility), I conclude for purposes of the Bank's stay relief motion that the Debtor's Plan is unfeasible. Although there are other creditors here, McEwen and Schuman will have the right to protect their interests as junior lienors in the Bank's pending foreclosure case. The Debtor will remain free to litigate with its creditors on the various claims it asserts against them, and vice versa. Although the unsecured creditors – whether they aggregate $973,000 or, as the Debtor's schedules and Disclosure Statement assert, a small fraction of that amount – will no longer be able to look to value in the Debtor's project for a recovery if stay relief is granted to the Bank, it appears to me that the existence of value in the Debtor's project which would reach down to the level of the unsecured creditors is at best conjectural.

Applying each of Judge Laney's *Desai* factors leads to an inescapable conclusion that the Debtor's agreement to waive the automatic stay should be enforced.

## Stay relief

Based on the discussion above, I find that stay relief is warranted under 11 U.S.C. § 362(d)(1). Section 362(d)(1) provides that stay relief should be granted "for cause, including the lack of adequate protection of an interest in property of such party in interest." The courts have interpreted the language of Section 362(d)(1) to include a wide range of circumstances constituting "cause" for stay relief. *See, e.g., In re Dixie Broad., Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989), (holding a petition filed in bad faith justifies lifting the stay); *In re Robbins*, 964 F.2d 342, 346 (4th Cir. 1992) (concluding cause exists where lifting the stay will promote judicial economy). The drafters of § 362(d)(1) acknowledged in the statute's legislative history the stay should be lifted where proceedings should continue in a non-bankruptcy forum:

> It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

S. REP. NO. 989, 95th Cong., 2d Sess. at 50 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5836.

Whether cause exists to grant stay relief is left to the discretion of the court on case by case basis. The court looks to the totality of the circumstances in each particular case when making this determination. *In re Aloisi*, 261 B.R. 504, 508 (Bankr. M.D. Fla. 2001); *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997) (*See also, In re Emerald Cove Villas, LLC*, 2007 Bankr. LEXIS 864, *8 (Bankr. M.D. Fla. Mar. 2, 2007)). The "decision to lift the stay is discretionary with the bankruptcy judge, and may be reversed only upon a showing of abuse of discretion." *In re Dixie Broad., Inc.*, 871 F.2d at 1026.

The Bank contends in its stay relief motion [DE 19] that this was indeed a bad faith filing, stating:

> This proceeding was filed on the eve of the Bank's state court foreclosure sale, and as the Debtor has already stipulated in the Forbearance Agreement, the Debtor is a single purpose entity, has few unsecured creditors and it is highly unlikely that a significant benefit to unsecured creditors would be achieved by a chapter 11 filing. In addition, the Debtor further stipulated in the Forbearance Agreement that the filing of the bankruptcy proceeding would be for the sole purpose of delaying the Bank's foreclosure action and would constitute a bad faith bankruptcy filing.

Motion for Relief From Automatic Stay [DE 19], ¶14. I do not need to determine whether this case was a bad faith filing in order to conclude that the Debtor has filed an unfeasible plan seeking a highly unlikely reorganization. However sturdily the Debtor's dry stack boat condominium project may have been built, the Debtor's reorganization is little more than a house of cards. Since under the circumstances of this case the Forbearance Agreement is enforceable, it is apparent to me that there is sufficient cause to grant the Bank the relief it seeks.

For the foregoing reasons, it is

**ORDERED** that the Bank's motion for stay relief [DE 19] is **GRANTED**.

###

Copies to

By CM/ECF:

Robert C. Furr
Kevin C. Gleason
Alvin S. Goldstein
Jordi Guso
Patti W. Halloran
Denyse Heffner
Andrew J. Nierenberg
Office of the United States Trustee
Craig A. Pugatch

Lisa M. Schiller

By mail:

Hollie N. Hawn
Broward County Attorney
115 S. Andrews Avenue
Ft. Lauderdale, FL 33301

Mr. Nierenberg is directed to serve all other parties in interest and to file a certificate of service within 10 days.